# State of New York Court of Appeals

## OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 56
In the Matter of Rebecca Seawright,
     Respondent,
       v.
Board of Elections in the City of New York,
     Appellant.
Louis Puliafito,
    Intervenor-Appellant.
(And Other Related Proceedings.)
-------------------------------------------------
No. 58
In the Matter of Ola Hawatmeh,
     Appellant,
       v.
New York State Board of Elections,
     Respondent,
James Goblet, et al.,
     Respondents.

For No. 56:
Elina Druker, for appellant
Lawrence A. Mandelker, for intervenor-appellant
Gregory Soumas, for respondent

For No. 58:
John Ciampoli, for appellant
Joseph T. Burns, for respondents Goblet et al.

PER CURIAM:

In <u>Matter of Seawright v Board of Elections in the City of New York</u>, the Appellate

Division, First Department, held that – in light of the "unique circumstances" created by

the COVID-19 pandemic – the candidate's belated filing of a cover sheet and certificate of

acceptance did not constitute a fatal defect (2020 NY Slip Op 02900, *1 [1st Dept May 14,

2020]).  In <u>Matter of Hawatmeh v New York State Board of Elections</u>, the Appellate Division, Third Department, rejected the First Department's approach and reached the opposite conclusion, holding that – notwithstanding the "unprecedented circumstances created by the COVID-19 pandemic" – the candidate's belated filing of a certificate of acceptance was a fatal defect (2020 NY Slip Op 02907, *1-2 [3d Dept May 15, 2020]).[1]

We granted leave to resolve this departmental split.  We now reverse in <u>Seawright</u> and affirm in <u>Hawatmeh</u>.

I

Seawright

On March 19, 2020, incumbent New York State Assembly Member Rebecca Seawright, a registered Democratic Party member, filed a petition designating her a candidate for the office of Member of the Assembly for the 76th Assembly District on the Democratic Party primary ballot.  Seawright's designating petition consisted of two volumes, each longer than 10 pages, and accordingly, under rules promulgated by the New York State Board of Elections (the "State Board") and the Board of Elections in the City of New York (the "City Board"), an accompanying cover sheet was required (<u>see</u> 9 NYCRR 6215.1 [b]; <u>id.</u> at 6215.1 [e] [3]; City Board Rule C1).  Seawright failed to file a

---

[1] Similarly, in <u>Matter of Jasikoff v Commissioners of Westchester County Board of Elections</u>, the Appellate Division, Second Department, held that the late filing of a designating petition was a fatal defect, notwithstanding the COVID-19 pandemic, because "the filing deadlines in the Election Law are mandatory and absolute, and are not subject to the discretion of the courts or the judicial fashioning of exceptions, regardless of how reasonable they may appear to be" (2020 NY Slip Op 02742, *1 [2d Dept May 7, 2020]).  That reasoning was expressly rejected by the First Department in <u>Seawright</u>.

cover sheet prior to the March 20 deadline, which was established by statute on March 18 (see L 2020, ch 24, § 1).

On March 19, Seawright also filed a petition designating her a candidate for the same office on the Working Families Party primary ballot. Because she was not a member of the Working Families Party, Seawright was required to file a certificate accepting this designation (Election Law § 6-146 [1]). Seawright failed to file a certificate of acceptance by March 24, the deadline imposed by Election Law § 6-158 (2) and chapter 24 of the Laws of 2020.

The City Board invalidated (1) Seawright's designating petition for the Democratic Party primary on the ground that she failed to timely file a cover sheet, and (2) Seawright's designating petition for the Working Families Party on the ground that she failed to timely file a certificate of acceptance. Seawright then commenced proceedings to validate her designating petitions. Louis Puliafito moved to intervene in Seawright's proceedings and also commenced separate proceedings, seeking to invalidate each of Seawright's two designating petitions. Seawright's filings noted that she was ill with "COVID symptoms" and was "ordered to quarantine" during the weeks surrounding the statutory deadlines.

Following a hearing, Supreme Court granted Seawright's petitions to validate and denied Puliafito's petitions to invalidate. The City Board and Puliafito appealed, and the Appellate Division, First Department, unanimously affirmed (see Matter of Seawright, 2020 NY Slip Op 02900). Emphasizing the "unprecedented circumstance of a statewide

health emergency," the Court determined that "the belated filing of these specific documents is not a fatal defect" (id. at *1).

### Hawatmeh

Ola Hawatmeh is a prospective Conservative Party candidate for the office of Member of the United States House of Representatives for the 19th Congressional District. From March 14 to March 24, 2020, Hawatmeh underwent prescheduled, out-of-state cancer treatment. On March 20, a petition was filed to designate Hawatmeh a Conservative Party candidate in the 19th Congressional District primary. Because she was not a member of the Conservative Party, Hawatmeh was required to file a certificate of acceptance (Election Law § 6-146 [1]). She failed to file the certificate by the recently established March 24 deadline (see Election Law § 6-158 [2]; L 2020, ch 24, § 1), and the State Board determined that Hawatmeh's designating petition was invalid because the certificate of acceptance was not timely filed.

Hawatmeh subsequently commenced a proceeding to validate the designating petition. Supreme Court dismissed the petition, agreeing with the State Board that Hawatmeh's certificate of acceptance was not timely filed. The Appellate Division, Third Department, affirmed, with one Justice dissenting, holding that the Court had no discretion to excuse the late filing (Matter of Hawatmeh, 2020 NY Slip Op 02907, at *2). Although the Court was "sympathetic to the difficult situation that [Hawatmeh] was placed in due to the pandemic," it determined that "the equitable remedy that she seeks is unavailable" (id.).

II

The Election Law provides that "[t]he failure to file any petition or certificate relating to the designation or nomination of a candidate for party position or public office or to the acceptance or declination of such designation or nomination within the time prescribed by the provisions of this chapter shall be a fatal defect" (Election Law § 1-106 [2]). Applying the Election Law, we have repeatedly held that the failure to timely file required papers in connection with a designating petition, including a cover sheet or certificate of acceptance, is a "fatal defect" that cannot be excused (see e.g. Matter of Plunkett v Mahoney, 76 NY2d 848, 850 [1990]; Matter of Hutson v Bass, 54 NY2d 772, 773-774 [1981]; Matter of Baker v Monahan, 42 NY2d 1074, 1075 [1977]; Matter of Carr v New York State Bd. of Elections, 40 NY2d 556, 558 [1976]). Strict compliance with the Election Law, we have held, "reduces the likelihood of unequal enforcement," emphasizing that "[t]he sanctity of the election process can be best guaranteed through uniform application of the law" (Matter of Gross v Albany County Bd. of Elections, 3 NY3d 251, 258 [2004] [internal quotation marks omitted]). Moreover, the provisions of the Election Law "make it crystal clear that the time limitations for filing are mandatory" and "foreclose the judiciary from fashioning exceptions, however reasonable they might" appear to be (Matter of Baker, 42 NY2d at 1074 [internal quotation marks omitted]). Accordingly, we have consistently mandated strict compliance with the time limitations imposed by the Election Law, notwithstanding a candidate's unique or extenuating circumstances (see

Matter of Plunkett, 76 NY2d at 850; Matter of Hutson, 54 NY2d at 774; cf. Matter of

Sheehan v Aylward, 84 AD2d 602, 603 [3d Dept 1981], affd, 54 NY2d 934 [1981]).

Though the Election Law has been amended over the years, these provisions and

principles have never been "abandon[ed]" (see Wilson, J., dissenting op at 14).  To the

contrary, even after the 1992 passage of the Election Reform Act, we reinforced that

untimely filings "dilute the integrity of the election process" and "jeopardize enforcement

of the mandatory filing requirements set forth in the Election Law" (Matter of Pierce v

Breen, 86 NY2d 455, 458 [1995]).  To resolve any doubt, this Court confirmed that "[t]he

Election Reform Act does not alter the strict filing provisions of Election Law § 1-106"

(id. at 459; see also Matter of Gross, 3 NY3d at 258 [discussing the importance of "strict

compliance with the Election Law," which provides "no invitation for the courts to exercise

flexibility in statutory interpretation"]).  Accordingly, "[w]hat the Court of Appeals said

35 years ago is still apt:  'It is wholly immaterial that the courts might reasonably conclude

that what they perceive as the ultimate legislative objectives might better be achieved by

more flexible prescriptions, prescriptions which might be judged by some to be more

equitable.  Whatever may be our view, the legislature has erected a rigid framework of

regulation, detailing as it does throughout specific particulars'" (Matter of Avella v

Johnson, 142 AD3d 1111, 1113 [2d Dept 2016] [internal quotation marks omitted], quoting

Matter of Hutson, 54 NY2d at 774).  Our adherence to the legislature's strict compliance

rule, in other words, remains intact.

The COVID-19 pandemic has undoubtedly presented uniquely challenging circumstances for Seawright and Hawatmeh – among countless other candidates for public office. Nonetheless, as in our prior cases, we remain constrained by the express directive of the Election Law: the complete failure to file, by the applicable deadline, either a cover sheet with a designating petition or a certificate of acceptance constitutes a "fatal defect" (Election Law § 1-106 [2]). The First Department's analysis, employed in Seawright, Mejia (___ NY3d ___ [decided herewith]), and Mujumder (___ NY3d ___ [decided herewith]), directly conflicts with that well-established statutory mandate.[2]

Notably, while several of the legislature's directives have been expressly suspended or modified in response to the public health crisis (see e.g. Executive Order 202.2 [March 14, 2020] [reducing signature gathering requirements for designating petitions]; Executive Order 202.7 [March 19, 2020] [allowing for notarization via "audio-video technology"]), and the legislature has itself modified the filing deadlines applicable in these appeals (see L 2020, ch 24), candidates have not been relieved from the consequences of a late filing. Nor have any measures been implemented that purport to confer judicial discretion or equitable authority to fashion further relief. "The time requirements for filing papers set forth in the Election Law are mandatory and absolute," and we are "without authority or

---

[2] Our dissenting colleague asserts that the decisions below relied on "extraordinary and unusual facts" that are "unlikely to re-appear in our lifetimes" while simultaneously contending that the First Department simply applied a straightforward, decades-old interpretation of the Election Law (Wilson, J., dissenting op at 9, 15-16). Even if both propositions could somehow be true, neither undermines the important goals of fairness and equality that are served when we resolve "conflict[s] among the departments of the Appellate Division" (22 NYCRR 500.22 [b] [4]).

discretion to fashion exceptions" – no matter how compelling the circumstances may be (Matter of Hawatmeh, 2020 NY Slip Op 02907, at \*2). It is for the legislature, not the courts, to decide when the law should "give way" (Rivera, J., dissenting op at 11) to the circumstances of the moment. During the most difficult and trying of times, consistent enforcement and strict adherence to legislative judgments should be reinforced – not undermined. Accordingly, in both Seawright and Hawatmeh, the candidates' untimely filings constituted fatal defects (Election Law § 1-106 [2]; see Election Law § 6-158 [2]; L 2020, ch 24).[3]

Even if unique circumstances were a license to disregard the Election Law, the theory endorsed by our dissenting colleagues relies on the alarmist and factually inaccurate premise that timely filing would have required Seawright to "disregard[] the public health by exposing others to a life-threatening virus" (Rivera, J., dissenting op at 2; accord Wilson, J., dissenting op at 10 [claiming that, to "appear on the ballot," Seawright would have been required to "risk[] her life and the lives of others"]). The City Board's cover sheet template explicitly allows for a "Candidate *or Agent*" to sign and submit the candidate's cover sheet (9 NYCRR 6215.8 [emphasis added]), and Seawright has never argued that she was responsible for filing the cover sheet, let alone that she was the only person associated with the campaign who was capable of filing it. In fact, in Mejia (___ NY3d ___ [decided herewith]) and Mujumder (___ NY3d ___ [decided herewith]), the

---

[3] We do not agree with our dissenting colleague's view (see Wilson, J., dissenting op at 20-22) that Hawatmeh's appeal can be disposed of on alternative grounds pursuant to Election Law § 1-106 (1).

candidates attributed the lateness of their cover sheets to the same third party "agent" who, according to his affidavit, was "responsible for filing the respective cover sheets." Seawright was similarly free to enlist the assistance of an agent, including any number of individuals associated with her campaign, to timely file her required cover sheet.

Nor were candidates required to break "mandatory quarantine" (Rivera, J., dissenting op at 2) in order to submit their certificates of acceptance. In her affidavit, Seawright asserts only that, because she was "ill and under quarantine," she could not seek out "a notary to witness in person [her] signature." However, Executive Order 202.7, issued on March 19, expressly permitted notarization using "audio-video technology," and the Election Law allows for certificates of acceptance to be mailed, rather than hand delivered, to the appropriate board of elections (see Election Law § 1-106 [1]). Tellingly, according to the City Board, more than 1,000 designating petitions were timely and properly filed in New York City alone – including by candidates experiencing the same challenges as these petitioners.

We have considered petitioners' remaining contentions and find them to be without merit.

In Seawright, the order of the Appellate Division should be reversed, without costs, the petitions by Rebecca Seawright to validate her designating petitions denied, and the petitions by Louis Puliafito to invalidate Seawright's designating petitions granted. In Hawatmeh, the order of the Appellate Division should be affirmed, without costs.

Matter of Seawright v BOE; Matter of Hawatmeh v State BOE
Nos. 56 & 58

RIVERA, J. (dissenting):

Petitioner Rebecca Seawright sought to run in the 2020 primary elections for a seat in the State Assembly.  The primary season coincided with the early stage of the novel Coronavirus (COVID-19) pandemic's spread to the United States and an increase in

COVID-19 cases in New York.  Petitioner became ill with COVID-19 symptoms and entered quarantine in her home in New York City, in accordance with public health directives.  Although she timely filed her designating petitions under the truncated filing period enacted by the State legislature in response to the coronavirus pandemic, she filed her cover sheet and certificate of acceptance after the new deadline, at the end of her quarantine and within the former deadline, which expired the following week.

The Appellate Division held that the delayed filing of these additional documents was not a fatal defect requiring invalidation of her timely filed designating petitions.  I agree and would affirm because the sole reason for the belated filing was petitioner's illness and mandatory quarantine due to COVID-19.  Petitioner's conduct did not involve fraud or result in prejudice.  Instead, petitioner quite rightly acted in compliance with governmental guidance and in furtherance of recent legislation intended to protect the public.  On this appeal, our choice is clear: punish petitioner for doing what the legislature, Governor and public health experts declared was necessary to protect herself and others, or reward what would have been the selfish act of disregarding the public health by exposing others to a life-threatening virus, so that she could file two sheets of paper by a deadline intended to reduce, rather than increase, candidate interaction with voters.  I find no logic in the majority's application of the law to invalidate her designating petitions under the unique circumstances of this case.

I.

On March 18, 2020, faced with the reality of a global pandemic and the growing awareness that New York State was the epicenter of a life-threatening, fast-spreading coronavirus, the legislature passed and Governor Andrew Cuomo signed into law Chapter 24 of the Laws of 2020 to address concerns of viral exposure during the current primary election petitioning process. As relevant to this appeal, the legislature sought to minimize exposure by shortening the statutory filing deadlines by mandating that "designating petition[s] for the June 2020 primary election shall be filed with the appropriate board of elections on March 17 through March 20, 2020" (L 2020, ch 24, § 1). As a result, the deadline for filing designating petitions and certificates of acceptance for the June 23, 2020 primary election were moved up from April 2, 2020 and April 6, 2020 to March 20, 2020 and March 24, 2020, respectively (see Election Law § 6-158 [1], [2]).

Petitioner was also subject to Election Law § 6-134 (2), which requires the "[s]heets of a designating petition shall be delivered to the board of elections in the manner prescribed by regulations that shall be promulgated by the state board of elections." Pursuant to the mandate of Election Law § 6-134 (2), the Rules of the Board of Elections in the City of New York (BOE) provides that a "cover sheet must be filed for all petitions containing ten or more sheets in one volume or consisting of more than one volume" (BOE Rules C.1; see also 9 NYCRR § 6215.1 [b]; id. § 6215.1 [e] [3]). Further, pursuant to Election Law § 6-146 (1),

> "if designated or nominated for a public office other than a judicial office by a party of which [they are] not a duly enrolled member . . . such person shall, in a certificate signed and acknowledged by [them], and filed as provided in this article, accept the designation or nomination as a candidate of each

such party or independent body other than that of the party of which [they are] an enrolled member, otherwise such designation or nomination shall be null and void."

Election Law § 6-158 (2) provides that such "certificate of acceptance or declination of a designation shall be filed not later than the fourth day after the last day to file such designation."

Under Election Law § 1-106 (2), "[t]he failure to file any petition or certificate relating to the designation or nomination of a candidate for party position or public office or to the acceptance or declination of such designation or nomination within the time prescribed by the provisions of this chapter shall be a fatal defect."  Although this Court has previously stated that failure to file a cover sheet within the timeframes prescribed by Election Law § 1-106 constitutes a fatal defect (Hutson v Bass, 54 NY2d 772, 774 [1981]), the statute makes no mention of a cover sheet.  Indeed, the New York City Board of Elections represented below that the cover sheet "is necessary for administrative convenience" (2020 NY Slip Op 02900, *2 [1st Dept May 14, 2020]).

II.

On March 19, 2020, the petitioner, a registered Democratic Party member and incumbent Democrat, filed two petitions respectively designating her a candidate for the office of Member of the Assembly for the 76th Assembly District on the Democratic Party and Working Families Party primary ballots.  Under the aforementioned statutory provisions and regulations, petitioner had to file a cover sheet by March 20, 2020 because her designating petition consisted of two volumes, each longer than 10 pages.  Petitioner

also had to file a certificate of acceptance in regard to her designation as the Working Families Party primary candidate by March 24, 2020 because she was not a duly enrolled member of this party. A cover sheet was filed on April 2, 2020 and a certificate of acceptance was filed on April 1, 2020, rendering them both untimely under the new deadlines of L 2020, ch 24, Election Law § 6-134 (2), BOE Rules C.1 and Election Law § 6-158 (2). As a consequence, the Board of Elections invalidated her petitions.

Whether the belated filing amounts to a "fatal defect" under Election Law § 1-106 (2) turns on the Appellate Division's fact-finding that the sole cause of the delay was COVID-19 illness or quarantine, as well as the obvious intent and purpose of the legislature in passing Chapter 24. After all, "[i]n statutory interpretation, legislative intent is the great and controlling principle" and there may be "instances where the literal meaning of words is not to be so slavishly adhered to as to defeat the general purpose and manifest policy intended to be promoted" (Carr v New York State Board of Elections, 40 NY2d 556, 559 [1976] [citations omitted]).

III.

A.

Petitioner's filings must be considered in proper context, so first I turn to the events surrounding her delayed submissions. The legislature enacted Chapter 24 on March 18, 2020, at the height of the COVID-19 pandemic during which New York State, and New York City in particular as the epicenter of the pandemic in the United States, experienced unique and extreme circumstances affecting every aspect of daily life. Through a series of

executive orders that were issued beginning on March 7, 2020 and continue to this day, the

Governor was at the time in the process of shutting down most activities in the state to

combat the spread of COVID-19, which had proven to be extremely infectious and deadly[1]

(see Executive Order 202 [March 7, 2020]; Executive Order 202.5 [March 18, 2020]).  In

fact, two days later on March 20, 2020, the Governor publicly announced the "New York

State on PAUSE" Executive Order and a 10-point plan to mitigate the pandemic, which

included the directive that "[s]ick individuals should not leave their home unless to receive

medical care and only after a telehealth visit to determine if leaving the home is in the best

interest of their health" (*Governor Cuomo Signs the 'New York State on PAUSE' Executive*

*Order*,        New        York        State        Governor        [March        20,        2020],

https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-

executive-order).  As further described *infra*, in implementing this policy, the Governor

relied on already-issued and subsequent executive orders to essentially direct individuals

to shelter at home.  At this time, it became clear that "[t]he state emergency caused by the

coronavirus pandemic necessitate[d] a truncated political calendar for petitions related to

---

[1] Between March 18, 2020 and April 3, 2020, New York saw the number of confirmed COVID-19 infections and deaths rise from 2,382 total cases and 16 total deaths to 102,863 total cases and 2,951 total deaths (Ben Axelson, *Coronavirus timeline in NY: Here's how Gov. Cuomo has responded to COVID-19 pandemic since January*, Syracuse.com [April 14, 2020], https://www.syracuse.com/coronavirus/2020/04/coronavirus-timeline-in-ny-heres-how-gov-cuomo-has-responded-to-covid-19-pandemic-since-january.html).     On March 18, 2020 alone, New York reported an increase of more than 1,000 positive COVID-19 cases from the day prior, which illustrates the extent of infections raging across the state (*As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000*, New York Times [March 18, 2020], https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html#link-4b523fc4).

the June 2020 primary election" (Mem in Support, L 2000, ch 24). This legislative action was part of a governmental effort to protect the public health and preserve the integrity of the electoral process by mitigating the spread of COVID-19, which included the Governor modifying the Election Law "to reduce [the] required number of signatures on petitions" to "1.5% of enrolled voters" or "30% of the stated threshold, whichever is less" and suspending the "gathering of signatures" "effective Tuesday, March 17, 2020 at 5 p.m." (Executive Order 202.2 at 1 [March 14, 2020]).

In addition, in several Executive Orders that affected all New Yorkers during this period and put the State on "pause," the Governor required all non-essential state and local government employees to work from home beginning on March 17, 2020 (Executive Order 202.4 at 1 [March 16, 2020]) and all businesses and nonprofits not providing "essential" services to allow workers to work for home as much as possible beginning on March 20, 2020 at 8 p.m. (Executive Order 206.2 at 2 [March 18, 2020]). The Governor suspended Election Law § 8-400, which governs absentee ballots, and allowed voters to electronically obtain absentee ballots for elections prior to April 1, 2020 (Executive Order 202.2 at 1 [March 14, 2020]); postponed any Village elections on March 18, 2020 (Executive Order 202.5 at 3 [March 18, 2020]); and prohibited all non-essential gatherings of individuals of any size (Executive Order 202.10 at 4 [March 23, 2020]).

Beginning March 14, 2020, the message from the executive and legislative branches to residents of New York was clear: stay home and cease all unnecessary physical interactions in order to contain the spread of COVID-19. By the Governor's express orders and the legislature's action, elections and the gathering of signatures to support an

individual's candidacy for election were modified during this time to further this policy. The ultimate purpose of truncating the political calendar for the June 2020 primary was therefore to protect the safety and well-being of candidates, their staff and the general public by ensuring all persons could limit interactions with other individuals who may be sick.

Furthermore, during this critical period in which relatively little was known about COVID-19 and all efforts were geared towards "flattening the curve,"[2] the New York State Department of Health (NYSDOH) issued guidance on quarantine protocols for COVID-19, classifying individuals who have been "in close contact (6 ft.) with someone who is positive, whether or not displaying symptoms for COVID-19" as persons who should mandatorily quarantine (*2019 Novel Coronavirus (COVID-19) Interim Containment Guidance: Precautionary Quarantine, Mandatory Quarantine and Mandatory Isolation Applicable to all Local Health Departments (LHD)*, New York State Department of Health [March 9, 2020], https://coronavirus.health.ny.gov/system/files/documents/2020/03/quarantine_guidance_ 0.pdf)[3]. Anyone displaying symptoms of COVID-19 was also required to stay inside and

---

[2] The phrase "flattening the curve" refers to slowing the spread of an illness during an epidemic such that the number of infections is spread out over time so that medical resources and staff are not overwhelmed (see Siobhan Roberts, *Flattening the Coronavirus Curve*, New York Times [March 27, 2020], https://www.nytimes.com/article/flatten-curve-coronavirus.html).  If a community does not act to mitigate the virus's spread, the result is often a steep rise and fall in cases, which leads to a sharp curve on a graph (id.). With mitigation, the number of cases is more consistent over time, showing a flatter curve on a graph (id.).

[3] According to the NYSDOH website, this document was first issued on March 9, 2020 (see "Travel, Large Gatherings and Quarantines," New York State Department of Health,

away from other individuals (William Feurer and Noah Higgins-Dunn, *Cuomo orders most New Yorkers to stay inside — 'we're all under quarantine now'*, NBC News [March 20, 2020] ["Sick people shouldn't leave their home unless they need to go to the doctor or hospital, [Governor Cuomo] said"]; see also *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*). As regularly repeated by government and public health officials, the success or failure of the public health directives depended on public compliance.

B.

Petitioner filed an affidavit in support of her request to validate her petitions with Supreme Court, stating that during March 2020, she was in close contact with many constituents while assisting hospitals, healthcare facilities, NYCHA residents and businesses. Notably, this contact included many visits to "Mary Manning Walsh Nursing Home on the Upper Eastside to help constituents, which subsequently was cited as having the highest COVID-19 related deaths in Manhattan." She stated she was also exposed to COVID-19 through close contact with three assemblymembers who later tested positive for the virus. And during the week of March 15th, petitioner personally experienced symptoms of COVID-19, leading her to be excused on March 18, 2020 from voting on Chapter 24 of the Laws of 2020 due to her symptoms. On March 24, 2020, petitioner had been diagnosed with and was experiencing "a contagious and infectious viral syndrome," requiring her to continue to self-quarantine as the deadline for filing a certificate of

---

https://coronavirus.health.ny.gov/travel-large-gatherings-and-quarantines [having "March 9, 2020" in the document title] [last accessed May 20, 2020]).

acceptance passed. Accepting this, Supreme Court found that "Seawright was also ill with COVID-19 symptoms during this time period and was quarantined during the deadlines (2020 NY Slip Op 31311[U], *4 [Sup Ct, NY County 2020]).

The Appellate Division made a factual finding that petitioner's "belated filing of a cover sheet and a certificate of acceptance" were solely attributable "to illness or quarantine because of the current COVID-19 pandemic," excluding any other possible cause for the delay (2020 NY Slip Op 02900 at *2), a finding that respondent Louis Puliafito concedes in his briefing to us. Of course, we are bound by and may not review that factual determination (Buchanan v Espada, 88 NY2d 973, 975 [1996]). Instead, our task is to consider petitioner's belated filings in light of the unique and unprecedented circumstances wherein the truncated filing deadlines were in potential conflict with official public health directives and quarantine guidelines.

The purpose of Chapter 24 was undeniably to mitigate the spread of COVID-19 and was part and parcel of an aggressive government response based on the determination that individuals manifesting symptoms should stay home and away from other people as much as possible. The truncated political calendar was not meant to force petitioner to meet the Election Law's filing deadlines when she was sick and complying with quarantine directives that made her unable to complete the filing without running afoul of the government guidance. Indeed, as an elected official tasked with promoting the government's response to the serious and deadly public health crisis afflicting New York, and finding herself to be symptomatic, petitioner was faced with the inherent tension in the new, compressed electoral filing timeframe and the government's guidance to avoid

physical interactions with others to prevent the spread of COVID-19. Since the truncated filing timeframe was passed to mitigate the pandemic, petitioner's completion of the self-isolation period resulting in the late filing of the remaining necessary election documents comported with the underlying purpose and intent of Chapter 24.

Moreover, petitioner's filing of the cover sheet and certificate of acceptance met the original statutory deadlines set forth before the passage of Chapter 24 since both documents were filed on or before April 2, 2020 (see Election Law § 6-158 [1], [2]). As the Appellate Division pointed out, "no claim of fraud has been alleged" with respect to petitioner's designating petition, "there is no evidence of specific actual prejudice presented," and the BOE seems to primarily "contend[] that a cover sheet is necessary for administrative convenience" (2020 NY Slip Op 02900 at *2).

The legislature and executive undoubtedly sought to place public health above administrative convenience in their passage of Chapter 24 and multi-pronged response to COVID-19. Thus, in this unique situation where petitioner did not and could not comply with an accelerated filing timeline solely because she was following the government's prescribed response to and recommendations for a pandemic, prior conflicting law and administrative convenience must give way to public health needs and the paramount right to ballot access. Petitioner's protected right to run for elected office as a Democratic and Working Families Party candidate (see Golden v Clark, 76 NY2d 618, 624-625 [1990]) cannot and should not be so easily subverted. In other words, the purpose and spirit of Chapter 24 was to mitigate the spread of COVID-19; the majority's narrow and inflexible reading of that provision, along with other relevant provisions of the Election Law, on the

unique facts of this case, does not further the intent of the legislature, but rather would have forced petitioner to violate the government's own guidance, putting herself and others at risk. Such a view leads to "objectionable results" and "cause[s] inconvenience, hardship, injustice[, ] mischief . . . [and] absurdity," in general disregard of the basic tenants of statutory interpretation (People v Ryan, 274 NY 149, 152 [1937]).

Contrary to the majority's view (majority op at 5-6), we are not constrained by our prior holdings in Hutson and Plunkett v Mahoney, as those cases dealt with delays and errors that directly relate to a candidate's "careless or inadvertent failure to follow the mandate of statute and case law," and not actions taken in accordance with governmental guidance during a highly unusual and unprecedented pandemic (see Hutson, 54 NY2d at 773-74; Plunkett v Mahoney, 76 NY2d 848, 848 [1990]). Instead, this precedent stands for the proposition that during "normal" times—when there is no life and death state of emergency requiring residents to shelter at home and minimize physical contact with others—the failure to timely file a cover sheet or certificate of acceptance is a "fatal defect" (see Hutson, 54 NY2d at 773-74; Plunkett, 76 NY2d at 848). Notably, the requirement for a cover sheet is regulatory, and our application of the election law cannot be dictated by regulatory requirements that conflict with the purpose and intent of Chapter 24. And while Election Law § 1-106 (2) states that failure to file a certificate is a "fatal defect," this provision must be read in harmony with the legislature and the executive's ongoing actions to protect public health during this historic pandemic.[4]

---

[4] Petitioner's appeal is distinguishable from Matter of Hawatmeh v New York Board of Elections (decided today), as the delay in that case was caused by that petitioner's need to

In fact, our prior holding in <u>Settineri v DiCarlo</u>, in which we validated the nominating certificates submitted by a technically *functus officio* County Republican Committee Chairperson because it was impossible for a qualifying Chairperson to make the official nomination, suggests that Election Law § 1-106 (2) must be read in line with legislative intent (82 NY2d 813, 816 [1993]).[5]  While the Appellate Division held in <u>Settineri</u> that the defect could not be corrected because the Election Law requirements are strict and the deadline could have been met if party had taken specific steps, such as asking the Board of Elections to expedite their canvassing, this Court reversed the Appellate Division on the basis of the dissent below (<u>Settineri v DiCarlo</u>, 197 AD2d 724, 725-26 [2d Dept 1993]; <u>Settineri</u>, 82 NY2d at 816).  Notably, this Court adopted the reasoning that "the legislature did not intend to disenfranchise voters by that framework of time

---

seek medical treatment, unrelated to COVID-19, out of state.  Further, the Appellate Division in <u>Hawatmeh</u> did not make a factual finding that the late filing of the certificate of acceptance was solely caused by the petitioner's illness with or quarantine due to COVID-19, as was the case here (see <u>Hawatmeh</u>, 2020 NY Slip Op 02900 [3d Dept May 14, 2020]).  However, I would reverse in <u>Hawatmeh</u> on timeliness grounds and join that portion of Section III (B) of Judge Wilson's dissent in which my colleague explains the petitioner's certificate of acceptance was timely filed under the plain language of Election Law § 1-106 (1).

[5] Specifically, in <u>Settineri</u>, the impossibility of a qualifying Chairperson filing the certificates was due to three overlapping rules and statutes: (1) a statutory requirement that a nomination must be filed after a primary election is held but within the seven days after the election; (2) a statute that allows the Board of Elections to take up to nine days to canvass a primary election's votes and certify the outcome of the election (and the Board took eight days in this particular case); and (3) the Republican Party's own rules that require the County Committee to elect a new Chairperson, who would have had the authority to file the nomination certificates, within 20 days after a primary election (<u>Settineri v DiCarlo</u>, 197 AD2d 724, 726-27 [2d Dept 1993] [Balletta, J. dissenting]).  Since the Board of Elections took eight days to canvass the voices and certify the outcome of the primary election, it was impossible for a qualifying Chairperson to meet the seven-day nominating deadline (<u>id.</u> at 727).

deadlines" (Settineri, 197 AD2d at 727 [Balletta, J. dissenting]), thereby holding that legislative intent must be paramount when interpreting the Election Law. The Appellate Division dissent also dismissed as speculative the argument that the proper nominating process could have been sped up (id. at 728).

In this appeal, following the reasoning of Settineri, we must read Chapter 24 in line with the overarching legislative intent of protecting public health above all else. As the majority notes, the Governor issued a series of executive orders that "suspended or modified" some of the legislature's directives "in response to the public health crisis" (majority op at 7). These orders evince the obvious intent to permit individuals to work and carry out essential business even during a shelter at home order and with the restrictions on business and public gatherings. In context and read altogether, they do not, as the majority and respondent contend (majority op at 7-8), show an express intent, by their omission in waiving some filing deadlines, to rigidly enforce accelerated deadlines when an individual would have to violate the government's many directives to stay home when ill. Rather, the tension between the filing deadlines and the government's public health orders must be harmonized and resolved in favor of the government's overall policy choices.

Contrary to the majority's suggestion (majority op at 8), this resolution that the belated filings were not a "fatal defect" is not an attempt to disregard or undermine enforcement of the Election Law, but a way to reconcile competing legislative and governmental directives and carry out this Court's constitutionally mandated responsibility of interpreting the law in line with the intent of the legislature (Carr, 40 NY2d at 559). It

is the majority that engages in speculating that petitioner could have safely designated an agent, a process which would have required an in-person signature (see 9 NYCRR 6215.8; 9 NYCRR § 6204.1 [c] [requiring designation of an agent to receive notices and determinations related to an objection to be in writing]); found a notary with the capability of notarizing her documents electronically during a pandemic; and safely passed off signed documents to her agent—all after the Appellate Division made a specific factual finding that the sole reason for the filing delay was petitioner's illness and self-quarantine. As Settineri instructs, the conflicting provisions of the Election Law must give way in the face of the impossibility of petitioner's ability to safely file the relevant documents within the truncated timeframe (see 197 AD2d at 728 [Balletta, J. dissenting], affd 82 NY2d at 816). Any possibility that petitioner may have been able to meet the deadline had other steps been taken is purely speculative and warrants no consideration (see id.).


IV.

The Appellate Division issued a thoughtful and narrow ruling taking into account the statutory requirements, case law and petitioner's compliance with state governmental quarantine guidance during the petitioning and filing period. As the record establishes, the belated filing of both documents was not a fatal defect based on "careless or inadvertent failure to follow the mandate of statute and case law" (Hutson, 54 NY2d at 774). To the contrary, respondent, sick with symptoms and aware of her duty as a member of the New York City community and an incumbent representative of her district, diligently sought to avoid spreading the virus and exposing voters and Board of Election staff by self-

quarantine.  The delay here was not in contravention or flagrant disregard of the purpose and spirit of the election law but rather in accordance with legislative and executive branch protocols established for the safety and health of the general public.

Accepting, as we must, the Appellate Division's factual finding that the sole cause of the delay was respondent's illness and quarantine, and in full recognition of the impact of the coronavirus public health crisis on New York City in particular and the legislative purpose animating Chapter 24, the delayed filings here are not fatal defects warranting invalidation of the designating petitions.  The legislature could not have intended to deny the right to ballot access under these circumstances.  I dissent.

Matter of Seawright v BOE; Matter of Hawatmeh v State BOE
Nos. 56 & 58

WILSON, J. (dissenting):

> "So it was that in this disease there was no cause which came within the province of human reasoning; for in all cases the issue tended to be something unaccountable. For example,

- 1 -

while some were helped by bathing, others were harmed in no less degree. And of those who received no care many died, but others, contrary to reason, were saved. And again, methods of treatment showed different results with different patients. Indeed the whole matter may be stated thus, that no device was discovered by man to save himself, so that either by taking precautions he should not suffer, or that when the malady had assailed him he should get the better of it; but suffering came without warning and recovery was due to no external cause . . . And at first the deaths were a little more than the normal, then the mortality rose still higher, and afterwards the tale of dead reached five thousand each day, and again it even came to ten thousand and still more than that."

(Procopius, History of the Wars 463-465 [H. B. Dewing, trans., Harvard University Press, 1914]).

"[S]orrow and sadness sat upon every face; and though some parts were not yet overwhelmed, yet all looked deeply concerned; and, as we saw it apparently coming on, so every one looked on himself and his family as in the utmost danger. Were it possible to represent those times exactly to those that did not see them, and give the reader due ideas of the horror that everywhere presented itself, it must make just impressions upon their minds and fill them with surprise. [The city] might well be said to be all in tears; the mourners did not go about the streets indeed, for nobody put on black or made a formal dress of mourning for their nearest friends; but the voice of mourners was truly heard in the streets."

(Daniel Defoe, A Journal of the Plague Year 28 [1722]).

"The streets of New York City are so desolate now that you half expect tumbleweed to blow along the pavement where cars and cabs once clustered. There is barely a plane in the sky. You hear the wheeze of an empty bus rounding a corner, the flutter of pigeons on a fire escape, the wail of an ambulance. The sirens are unnervingly frequent. But even on these sunny, early-spring days there are few people in sight. For weeks, as the distancing rules of the pandemic took hold, a gifted saxophone player who stakes his corner outside a dress shop on Broadway every morning was still there, playing 'My Favorite Things' and 'All the Things You Are.' Now he is gone, too."

(David Remnick, <u>New York City in the Coronavirus Pandemic</u>, The New Yorker, April 5, 2020, https://www.newyorker.com/magazine/2020/04/13/new-york-city-in-the-coronavirus-pandemic).

We are living through extraordinary times, attempting to hold true to the foundation of our democracy, elections, while defending against a global pandemic. That pandemic has stricken nowhere more fiercely than in New York City. New York schools, workplaces, restaurants, cultural institutions, and stores have been shuttered. Our once-bustling streets are empty; the lights of an empty Times Square, if ever cheery, are now unquestionably eerie; the New York City subways, largely vacant, no longer run overnight. Our city that never sleeps is comatose. In New York City alone, almost 200,000 people have been infected with and more than 15,000 people have died from COVID-19, although both of those numbers are likely underreported. Initially the virus appeared to impact the elderly population primarily, but we have later seen its horrifying effects on those of all ages, including children. Young and otherwise healthy adults have also not been spared: "The second day I was sick [with COVID-19], I woke up to what felt like hot tar buried deep in my chest. I could not get a deep breath unless I was on all fours. I'm healthy. I'm a runner. I'm 33 years old" (Mara Gay, <u>'I Wish I Could Do Something for You,' My Doctor Said</u>, NY Times, May 14, 2020, https://www.nytimes.com/2020/05/14/opinion/coronavirus-young-people.html).

Through all this, one of the candidates here, Ms. Seawright, dutifully complied with Governor Cuomo's Executive Orders to stay home while she was experiencing COVID-19 symptoms; the majority has struck her from the ballot in the June primary. The other

candidate, Ms. Hawatmeh, left her out-of-state cancer treatment early in order to file her petition-related paperwork in New York on the advanced deadlines put into place due to the pandemic; she too has been struck from the ballot.

In response to the COVID-19 public health emergency, two branches of our state government have done their utmost to preserve both our democratic institutions and our people. The executive and legislative branches hurriedly adjusted the political calendar and requirements, while imposing numerous rules designed to curb the spread of the virus. The Appellate Division, First Department, confronted with the omnipresent specter of disease and death, took great pains to craft a narrow decision tailored to effectuate the intent of those branches and preserve the core of our democratic principles.

I have two disagreements with our resolution of these cases. First, following our merits examination of these cases, we should have rescinded our grants of leave as improvident. There is no reason to retain these cases to restate law the majority contends is settled so that, when and if the next pandemic arrives, the lower courts of 2120 will have clear guidance. Second, the majority should have realized that as to these cases, our Election Law must be interpreted in light of the will of the legislature; the new, pandemic-related laws; and, perhaps most importantly, the public health catastrophe facing New York.

I.

Governor Cuomo declared a state of emergency on March 7, 2020. On March 14, in response to the added difficulties of running for public office during a global pandemic, the Governor issued Executive Order 202.2, reducing the number of signatures a candidate

in the June primary needed to obtain to be placed on the ballot. Before the state of emergency was declared, a candidate intending to run in the June primary election was required to file a designating petition between March 30 and April 2, 2020 (Election Law § 6-158 [1]). The corresponding certificates of acceptance would have needed to be filed no later than four days after April 2 (Election Law § 6-158 [2]).[1]

On March 18, 2020, the legislature enacted, and the Governor signed, chapter 24 of the Laws of 2020. It superseded Election Law § 6-158 (1) and mandated that "a designating petition for the June 2020 primary election shall be filed with the appropriate board of elections on March 17, 2020 through March 20, 2020" (L 2020, ch 24). The deadline to file a certificate of acceptance under Election Law § 6-158 (2) became March 24, 2020. Chapter 24 thus advanced the deadline for filing both a designating petition and a certificate of acceptance by about two weeks. The legislature justified advancing the petition deadlines by stating that the "state emergency caused by the coronavirus pandemic necessitates a truncated political calendar for petitions related to the June 2020 primary election." [2]

---

[1] The Governor postponed the presidential primary, originally planned to be held on April 28, until June 23 in an attempt to preserve the ability of citizens to vote without jeopardizing their lives or the lives of others. He also ordered "New York State on PAUSE" on March 20, requiring people to stay at home except for essential matters.

[2] The Election Law has traditionally provided a four-day period during which designating petitions may be filed (see Election Law § 6-158 [2]). It appears the legislature's intention in the 2020 pandemic-related legislation was to preserve that four-day period but move it to an earlier set of dates (see L 2020, ch 24). However, because the law was not adopted until late in the evening on March 18, the first two days of the March 17-20 period had already lapsed, leaving just March 19 and 20 for filing such petitions.

The candidate at issue here, Rebecca Seawright, sedulously filed two petitions designating her as a candidate of both the Democratic Party and the Working Families Party for the public office of Member of the New York State Assembly in the 76th District on March 19 – a day before the final day to file and less than one day after the enactment of chapter 24. Both petitions contained more than the requisite number of signatures and were bound according to the Board of Elections regulations. During this period of time, Ms. Seawright was ill with COVID-19 symptoms, under a doctor's care, and ordered to quarantine.[3] Ms. Seawright did not file the cover sheet for her Democratic Party petition by March 20 (see Election Law § 6-134; 9 NYCRR 6215.1 [b], [c]).[4] She also did not file a certificate of acceptance for the Working Families Party petition by March 24 (see Election Law § 6-146; Election Law § 6-158 [2]).[5] Despite her doctor-ordered isolation and the lack of any notice from the Board of Elections, Ms. Seawright cured both deficiencies on April 2 when she filed a cover page for her Democratic petition and a certificate of acceptance for her Working Families Party petition.

---

[3] Judge Rivera's dissenting opinion, in which I join, contains more detail about Ms. Seawright's circumstances.

[4] Because her Democratic Party petition consisted of more than 10 pages, it required a cover sheet whereas her Working Families Party petition did not (9 NYCRR 6215.1 [b]).

[5] Only her Working Families Party petition required a certificate of acceptance under Election Law § 6-146 (1) ("if designated or nominated for a public office other than a judicial office by a party of which he is not a duly enrolled member . . . such person shall, in a certificate signed and acknowledged by him, and filed as provided in this article, accept the designation or nomination as a candidate of each such party or independent body other than that of the party of which he is an enrolled member, otherwise such designation or nomination shall be null and void").

The Board, presumably also working under extraordinary conditions resulting from the pandemic, took until April 15 to alert Ms. Seawright to the asserted deficiencies. At that point, the Board believed the errors to be fatal and thus not subject to cure under 9 NYCRR 6215.7 (d), which states that a candidate "may, within three business days of the date of a determination that the petition does not comply with these regulations, cure the violation of these regulations." On April 21, the Board determined that her delayed filings of a cover sheet and a certificate of acceptance were fatal defects invalidating both of Ms. Seawright's designating petitions.

On Ms. Seawright's motion to validate her petitions, Supreme Court found that she substantially complied with Election Law requirements and held that the Board of Elections thus erred in deeming her untimely submissions to be fatal to her candidacy. Recognizing "the unprecedented and catastrophic health crisis," the court also found that Ms. Seawright's submissions were filed by April 2, that there were no claims that the deficiencies were fraudulent or "used for any improper purpose," and that neither the Board nor her opponents were prejudiced from the late filing of her cover sheet and certificate of acceptance. The Appellate Division affirmed the order of Supreme Court, holding that "under the unique circumstances existing in New York City during the past few months, and the specific health challenges alleged here, the belated filing of these specific documents is not a fatal defect" (Matter of Seawright v Board of Elections in the City of New York, 2020 NY Slip Op 02900, *1 [1st Dept May 14, 2020]). That court likewise found that there was no evidence of prejudice, no challenge had been made to the number

of signatures, and there was no claim of any fraudulent, misleading or deceptive actions (id.).  The majority does not dispute those findings.

## II.

Unlike the Appellate Division, which had no choice but to decide these cases, our docket is largely discretionary.  As explained in our own Rules of Practice, we define a "leaveworthy" case as a case in which "the issues are novel or of public importance, present a conflict with prior decisions of this Court, or involve a conflict among the departments of the Appellate Division" (22 NYCRR 500.22 [b] [4]).  Each year, we turn away hundreds of cases because, in our judgment, deciding them would have no significant statewide import.  In many of those cases the result is wrong, unfair or questionable, but because a reversal would not advance the law in an area in which advancement is needed, we decline to hear such cases (see Arthur Karger, Powers of the NY Court of Appeals § 10:3 ["the primary, though not the sole, function of the Court of Appeals is conceived to be that of declaring and developing an authoritative body of decisional law for the guidance of the lower courts, the bar and the public, rather than merely correcting errors committed by the courts below"]).

As a general matter, we should not interpret the laws of the state based on extraordinary and unusual facts that are not likely to recur.  The First Department's decision carves out a very narrow exception, specifically limited to the facts of this pandemic, the restrictions attendant to it, and the particular minor defects at issue here.  The Third Department disputes that rationale, though as I explain below, the Third Department should never have reached this issue, because Ms. Hawatmeh's filing was patently timely.  Thus,

the departmental split between the First and Third Departments occurred simply because of the Third Department's misreading of the statute governing timeliness of service. Moreover, the existence of even a genuine departmental split does not always result in our acceptance of the first case that might allow us to resolve the split.

In any event, the departmental split here involves the interpretation of what constitutes "substantial compliance" under the unique circumstances of this pandemic and the particular facts of these cases. The nature and scale of the current emergency and responses to it, including stay-home and quarantine directives, has not been seen for a hundred years and is unlikely to re-appear in our lifetimes. The immensely unlikely recurrence of such circumstances peaking during an election petitioning period renders these cases not leaveworthy. Thus, the better course here would have been to rescind our grant of leave as improvident (see e.g. Piccircillo v State of New York, 91 S Ct 520 [1971]). There is no pressing need to correct the "errors" of the Appellate Division and, by doing so, remove from voters the ability to cast votes for candidates of their choosing in as fair an election as can be constituted under the present, immensely challenging circumstances. Because the First Department, recognizing the unique confluence of the pandemic, the governmental responses to it, and the pendency of the election, explicitly cabined its decision to those circumstances and the omissions at issue here, its decision has no consequences for the Election Law in ordinary circumstances – indeed, it had no consequences except as to this particular ballot. The unfortunate result of retaining these cases is the announcement of a never-again-to-be-cited rule: a candidate may either follow

medical and gubernatorial orders and lose her candidacy or appear on the ballot by risking her life and the lives of others.

## III.

As the cases have remained here, I would affirm in <u>Seawright</u> and reverse, albeit on other grounds, in <u>Hawatmeh.</u>

## A.

Of the many forms required of candidates running for office, Ms. Seawright – while quarantined with COVID-19 symptoms – failed to submit just two pieces of paper. She initially did not affix a cover sheet on her Democratic Party petition, and she failed to file a certificate of acceptance within four days of the last filing day for her Working Families Party petition. Pursuant to Election Law § 6-134 (2), the "[s]heets of a designating petition shall be delivered to the board of elections in the manner prescribed by regulations that shall be promulgated by the state board of elections"; the Board's regulations are to "be no more restrictive than is reasonably necessary for the processing of such petitions by the board of elections." Those regulations state that "all petitions containing 10 or more sheets shall be accompanied by a cover sheet" (9 NYCRR 6215.1 [b]).

A designating petition contains the signatures and addresses of registered voters who have petitioned to place a certain candidate on the ballot for a specified office, and the date on which each voter signed the petition. Every single page of the petition bearing signatures also states the candidate's name and address, the office sought, and the party designation. In addition, each page of the petition contains a sworn attestation that the

information therein is true and correct (Election Law § 6-132 [2]). Each volume of a petition must be separately bound (9 NYCRR 6215.1 [c]).

The Board provides a simple form cover sheet for candidates to use (9 NYCRR 6215.8). The Board's regulations require these cover sheets to contain the office and district number of the designation the candidate seeks; the name and address of the candidate; and the number of volumes in the petition (9 NYCRR 6215.2 [a] [1]). The only information on the cover sheet not readily determinable from the petition itself is the identity and contact information for the candidate's representative whom the Board should contact in case of an irregularity in the petition (9 NYCRR 6215.2 [a] [4]). The cover sheet also contains a statement of the total number of signatures contained in the petition, but an incorrect count on the cover sheet is not a fatal defect (9 NYCRR 6215.2 [a] [3]; Staber v Fidler, 65 NY2d 529, 535 [1985]).

Likewise, the Board provides a simple form certificate of acceptance for candidates. The certificate of acceptance is not required for the party in which the candidate is a member; it is required only when another party designates the candidate on its ballot line or if the candidate is designated "by an independent body alone" (Election Law § 6-146 [1]). The sole purpose of the certificate of acceptance, then, is to make certain that a candidate wishes to accept the designation of a party in which the candidate is not a member. The fraud or impropriety it might avoid is a circumstance in which a party wishes to nominate a person who does not want to appear on that party's ballot line. That circumstance is not present here, and the late filing of such a certificate can in no way undermine the certificate's purpose.

Ms. Seawright ultimately filed both a cover sheet for her Democratic Party petition and a certificate of acceptance for her Working Families Party petition on April 2.[6] Contrary to the majority's view (majority op at 5), this Court has never held that the initial absence of a cover sheet is an uncurable defect. Indeed, Election Law § 6-134 (2) grants the Board the ability to regulate the requirements for designating petitions as long as the Board's requirements are "no more restrictive" than necessary. The statute then instructs that a candidate must be provided with three business days, once notified, to cure a violation of the Board's regulations (Election Law § 6-134 [2]). Moreover, Election Law § 6-134, the section of the statute that by its title prescribes the rules for designating petitions, must be "liberally construed, not inconsistent with substantial compliance thereto and the prevention of fraud" (Election Law § 6-134 [10]; see also 9 NYCRR 6215.6 ["Except as specifically set forth herein, these rules shall be liberally construed and technical defects shall be disregarded where there has been substantial compliance and where a strict construction is not required for the prevention of fraud"]). The statute on its face thus requires substantial rather than strict compliance when "no potential for fraud . . . is apparent" (see Staber v Fidler, 65 NY2d at 535). Here, there have been no allegations

_____

[6] The majority contends that Ms. Seawright did not file her cover sheet on time because it was not received by March 20 (majority op at 2-3), but that is not the law. A candidate may cure any cover sheet deficiency within three days of being notified by the Board that such a deficiency exists (9 NYCRR 6215.7[d] ["Cover sheet deficiencies may be corrected by the filing of an amended cover sheet. A candidate may, within three business days of the date of a determination that the petition does not comply with these regulations, cure the violation"]). Because Ms. Seawright was not notified until April 15 of the deficiency in her cover sheet, she had until April 18 to correct it – long after she had already cured it.

of fraud and Ms. Seawright has substantially complied with the obligations of the Election Law. Therefore, her designating petitions should be validated.

Because we must apply a substantial compliance standard to the deficiencies in Ms. Seawright's petition, the question here is not whether – in an ordinary election cycle – Ms. Seawright's delays in filing might or might not substantially comply with the Election Law, but rather whether Ms. Seawright substantially complied with the Election Law under the totality of the extraordinary circumstances facing her. Those anomalous circumstances require us to affirm the First Department's narrow decision finding Ms. Seawright substantially complied with the Election Law. A careful examination of the changes to the Election Law over time supports that outcome and demonstrates the majority's clear error in failing to consider the meaning of "substantial compliance" in Ms. Seawright's case.

To begin, in 1969, the legislature added the "fatal defect" language to the Election Law upon which the majority hangs its hat (Election Law § 1-106 [2]; see Bill Jacket, L 1969, ch 529). The legislative history of that addition shows that the "fatal defect" language was added "to limit the discretionary powers of the Supreme Court . . . [to] relieve a mistake or accident leading to a delay in filing a certificate of acceptance within the proper time limits" (Mem of the Attorney General, Bill Jacket, L 1969, ch 529, at 2). The Department of State's memorandum to the Governor explained that the amendment's purpose was to effectuate the legislature's "inten[tion] that such provisions be construed strictly" (Mem of the Dept of State, Bill Jacket, L 1969, ch 529, at 6).

In the decades following that amendment, our Court interpreted the "fatal defect" amendment to the Election Law as requiring that deadlines for election-related filings be

absolute and not subject to judicial discretion. The majority's holding rests on several of those cases: Matter of Carr v New York State Board of Elections (40 NY2d 556 [1976]), Matter of Baker v Monahan (42 NY2d 1074 [1977]), Matter of Hutson v Bass (54 NY2d 772 [1981]), and Matter of Plunkett v Mahoney (76 NY2d 848 [1990]). In those cases, we correctly implemented the 1969 legislature's intent to create a "rigid framework of regulation" mandating harsh time limits for election filings (see e.g. Carr, 40 NY2d at 558; Hutson, 54 NY2d at 774).

Experience with that strict compliance framework led to widespread criticism, and then to its abandonment. Indeed, in the years leading up to the sweeping legislative reforms discussed below, our Court questioned the strict compliance regime in some of the very cases upon which the majority relies. In Matter of Hutson, for example, we cautiously noted that it was "immaterial that the courts might reasonably conclude that what they perceive as the ultimate legislative objectives might better be achieved by more flexible prescriptions, prescriptions which might be judged by some to be more equitable" (Matter of Huston, 54 NY2d at 774). And, just a few years later, we amplified our prior suggestion by noting that "a strictness of construction beyond that necessary for the effectuation of those policies can . . . lead to injustice" in Election Law matters (Staber, 65 NY2d at 534).

The executive branch also criticized the strict compliance standard. Robert Abrams, the State's Attorney General, publicly wrote that New York's laws had "spawned almost half of all Election Law litigation in the nation" (Robert Abrams, Comprehensive Election Law Reforms Advocated by State Attorney General; Law Day '92: The Struggle for Justice, NYLJ, May 1, 1992 at 3, col 1). He denounced New York's unyielding ballot

restrictions, which led to "example after example of candidates being removed from the ballot for trivial errors," and advocated reforms that would encourage people to run for office, instead of the "series of obstacles that only those well versed in the technicalities of the law can overcome" (id.). Those outside the government made similar observations: "For decades New York's ballot access laws have made us the laughingstock of the nation" (Letter from Andrew Greenblatt, Executive Director, Common Cause/NY, July 12, 1996, Bill Jacket, L 1996, ch 709 at 30).

In response to such criticism, the legislature reversed direction, removing the strict compliance regime of 1969 through successive reforms of the Election Law in 1992 and 1996. Through enacting the Election Reform Act of 1992 and the Ballot Reform Act of 1996, the legislature sought to "facilitate ballot access for candidates" (Sponsor's Mem, Bill Jacket, L 1992, ch 79, at 27) and to make ballot access "simpler and fairer for candidates in political-party primary elections" (Sponsor's Mem, Bill Jacket, L 1996, ch 709, at 15); see also Letter from Jonathan Burman, Director of Legis Affairs, Assn of Bar of City of NY, Bill Jacket, L 1996, ch 709, at 29 [the bill "goes a long way towards the critically important goal of easing those requirements which govern access to the ballot"]). In promoting the Ballot Reform Act of 1996, the Governor expressly repudiated the strictly construed regime of 1969, approving the legislature's replacement of it with one of liberal construction (Governor's Mem, Bill Jacket L 1996, ch 709, at 18 ["all rules relating to the validity and submission of petitions are to be liberally construed"]). Specifically, these two Acts repealed the "complex and burdensome rules for attaching cover sheets to petitions and bundling petitions" and assured that "any deficiencies regarding cover sheets"

could be cured (id.; Sponsor's Mem, Bill Jacket, L 1996, ch 709, at 16 [emphasis added]). Taken together, these reforms emphasize the legislature's intent to eliminate, not ossify, the severe punishments for technical defects in petitions (see Cozzolino v Columbia County Board of Elections, 218 AD2d 921, 922-923 [3d Dept 1995]).

Our legislatively-superseded caselaw predating those reforms furnishes a foundation thinner than quicksand for today's decision. After two decades of experience with the strict compliance regime, both the legislature and the Governor lambasted "New York's nationally notorious ballot access laws" and the "hypertechnical intricacy" of New York's Election Law, which "set[] traps for the unwary" and "frustrate[d] democracy" (Sponsor's Mem, Bill Jacket, L 1992, ch 79, at 29; Governor's Mem, Bill Jacket, L 1992, ch 79, at 30). "Harmless mistakes on the petition forms [] no longer [] mean the end of a campaign" (Governor's Mem, Bill Jacket, L 1992, ch 79, at 31). We must then view Ms. Seawright's cured cover page and certificate of acceptance not in light of our precedent from the 1970s and 1980s but rather in the context of the legislative enactments sweeping away those cases: Ms. Seawright's filing deficiencies are "harmless mistakes" that should not doom her candidacy, preventing voters from having their choice of candidate on the ballot.

The majority provides no explanation for its disregard of the statutory language requiring substantial compliance and liberal construction with respect to designating petitions, arguing instead that we have not abandoned a strict compliance scheme. To support that proposition, the majority turns to Matter of Gross v Albany County Board of Elections (3 NY3d 251, 258 [2004]). That case, however, deals with an entirely different

section of the Election Law pertaining to absentee ballots – one to which the 1992 and 1996 ballot access amendments do not apply.  In contrast to Election Law § 6-134, which by its text requires only "substantial compliance," Election Law § 9-209 has no such provision. The fact that those sections of the Election Law are incomparable is made clear in the Gross Court's observation of the "magnitude" of the errors in that case, far from the "minor alteration of procedure [that] can be viewed as substantial compliance with statutory directives" here (id. at 260).  Even were Gross relevant, it undermines the majority's position.  Gross expressly noted that there "are instances where inconsequential deviations from the letter of the law will not be fatal" (id.).

Pierce v Breen (86 NY3d 455 [1995]) does not support the majority's position either.  The legislative reforms of 1996, which were specifically targeted at "eliminating a myriad of technicalities that have long been used to invalidate petitions" (Governor's Mem, Bill Jacket L 1996, ch 709, at 18), were enacted after Pierce.  As the majority itself acknowledges, "[i]t is for the legislature, not the courts, to decide when law should 'give way'" (majority op at 11, quoting Judge Rivera's dissenting op at 11): in 1996, the legislature plainly told the courts that the prior regime must give way to the new.  More importantly, Pierce does not support the majority's position here.  In that case, we held that the premature filing of a certificate of nomination, "not in compliance with the strict election timetable," was a fatal defect (86 NY2d at 455).  That case concerned a substantive violation that "would dilute the integrity of the election process," because the Schoharie County Democratic Committee had nominated the candidate before the primary election took place – effectively denying voters the chance to select someone else.  In so holding,

we emphasized that "there [wa]s simply no valid explanation for the premature meeting and filing" (id. at 458-459). Pierce, therefore, comported with the legislature's revised direction to interpret the Election Laws liberally, keeping in mind substantial compliance and the prevention of fraud. In contrast, Ms. Seawright's filing delays – presenting no risk of fraud or harm to the integrity of the electoral process – are just the sort of hypertechnical errors the legislature rejected as reasons to bar ballot access.

Ms. Seawright cured the technical violations to her designating petitions on April 2 when, after having been quarantined, she filed a single cover sheet and a certificate of acceptance. There were no allegations of fraud, her designating petitions demonstrated that voters want her on the ballot, and she timely filed her designating petitions despite the truncated and advanced filing deadlines – all while COVID-19 wreaked havoc on New York City. By striking Ms. Seawright from both the Democratic Party and Working Families Party ballots, the majority has endangered the right of voters to cast their votes effectively, a precious freedom that should not be lightly treaded upon. The reforms to New York Election Law in the 1990s – and the Governor's and legislature's recent enactments[7] – were intended to protect against this exact circumstance and ensure that no

---

[7] Indeed, by issuing Executive Order 202.2, Governor Cuomo sought to preserve our democratic institutions and provide candidates access to the ballot despite the unique and difficult circumstances of the pandemic. In addition to dramatically reducing the number of required signatures a candidate needed to obtain in order to appear on the June 23 ballot, the Order allowed for electronic applications for absentee ballots in some elections – such measures show the Governor's commitment to prevent candidates from being struck from the ballot during the pandemic and to prevent voters from being disenfranchised as a result. Chapter 24 of the Laws of 2020, duly enacted by the legislature on March 18, serves the same purpose: by truncating the political calendar and advancing the deadline to file by two weeks, chapter 24 guarantees that the primary ballots will be ready by June 23 and

candidate be denied access to the ballot for technical defects that do not relate to the fairness

of the process under such extraordinary conditions. Ms. Seawright's corrected submissions

in these extreme circumstances should not prevent her from remaining on the ballot in the

June primary.

B.

Although the majority perceives a conflict between the First Department's

reasoning and the reasoning of the Third Department in Ms. Hawatmeh's case, those cases

are readily distinguishable based on the different conditions prevailing in March 2020 in

New York City and Pleasant Valley, New York, whence Ms. Hawatmeh hails; or based on

the differences in the candidates' physical conditions. The absence of any genuine conflict,

and with it the absence of any reason to retain leave in these cases, is further underscored

by the fact that Ms. Hawatmeh's designating petition for the Conservative Party was timely

filed. The Third Department's conclusion that Ms. Hawatmeh's petition was untimely

because it was not "postmarked prior to midnight of the last day of filing" is incorrect on

the face of Election Law § 1-106 (1) (Matter of Hawatmeh v New York State Board of

Elections, 2020 NY Slip Op 02907, *1-2 [3d Dept May 15, 2020]).

---

ensures that all voters will have their choice of candidate on the ballot. The majority, however, comes to the opposite conclusion: its interpretation of the recent enactments penalizes candidates for technical defects in completely anomalous circumstances and suggests that the legislature intended to "abort candidacies and disenfranchise voters" (see Hogan v Goodspeed, 196 AD2d 675, 678 [3d Dept 1993]). That is surely not the case; rather, these recent enactments were intended to allow the primary elections to proceed with as much participation as possible under the circumstances.

Relying on the original April 2, 2020 deadline for filing designating petitions, Ms.

Hawatmeh's scheduled cancer treatment in St. Louis, Missouri for March 14-24, 2020. Her

petition designating her a Conservative Party candidate the United States House of

Representatives for New York's 19th Congressional District was timely filed, complete

and error-free. Upon learning of the change to Election Law § 6-158 pursuant to chapter

24 of the Laws of 2020 on March 22, Ms. Hawatmeh flew back to New York in the midst

of a global pandemic grounding flights and requiring state-wide lockdowns. Upon arrival

in New York, she signed the certificate of acceptance in front of a notary on March 24,

though the post offices were closed by the time she did so. On March 25, she sent the

certificate by overnight delivery via Priority Mail Express, and the State Board of Elections

received it on March 26, 2020.

The majority now repeats the Appellate Division's error. Ms. Hawatmeh's

certificate of acceptance was timely filed under the plain language of Election Law § 1-

106 (1). The statute reads as follows, in pertinent part:

> **"All papers sent by mail in an envelope postmarked prior
> to midnight of the last day of filing shall be deemed timely
> filed** and accepted for filing when received, **except that** all
> certificates and petitions of designation or nomination,
> **certificates of acceptance** or declination of such designations
> or nominations, certificates of authorization for such
> designations or nominations, certificates of disqualification,
> certificates of substitution for such designations or
> nominations and objections and specifications of objections to
> such certificates and petitions **required to be filed with the
> state board of elections or a board of elections outside of
> the city of New York shall be deemed timely filed and
> accepted for filing if sent by mail or overnight delivery
> service pursuant to subdivision three of this section, and
> received no later than two business days after the last day**

> **to file such certificates, petitions, objections or specifications. Failure of the post office or any other person or entity to deliver any such petition, certificate or objection to such board of elections outside the city of New York no later than two business days after the last day to file such certificates, petitions, objections or specifications shall be a fatal defect"**

(emphases added).

Election Law § 1-106 (1), thus, contains different geographically based timeliness requirements for certificates of acceptance and other election-related filings: one for filings made with boards of elections within New York City, and one for filings made with all other boards of elections, including the State Board of Elections, the board to which Ms. Hawatmeh's certificate was sent. The requirement for postmarking on the last day to file – March 24 – applies to New York City only. The exception for all other boards of elections, including the State Board of Elections, contains no postmarking requirement, only a requirement that the applicable board of elections <u>receives</u> the certificate of acceptance no later than two days after the last date to file – here, March 26. Two other features of the statute confirm the plain words used in the exception. First, the New York City postmarking requirement applies to papers "sent by mail," whereas the provision for filing outside of New York City permits filing by "mail or overnight delivery service." Overnight delivery services cannot provide a postmark. Second, for filings sent to boards of elections outside of New York City, the statute contains a special provision making it a "fatal defect" if the post office or other delivery service fails to deliver the filing within the two-day period. That provision would be superfluous under the majority's interpretation. Concluding, as the majority does, that the State Board's receipt of Ms. Hawatmeh's petition

on March 26 was a "fatal defect" contravenes the unmistakably clear language of Election Law § 1-106 (1).  Ms. Hawatmeh timely filed her certificate of acceptance.

*      *      *

What is gained by retaining these cases for merits decisions, reversing <u>Seawright</u> and affirming <u>Hawatmeh</u>?  No fraud is avoided, no prejudice to an opponent is ameliorated, no voter confusion is avoided.  No departmental split having any import is resolved. Instead, the majority applies what it calls a strict construction of the Election Law to remove Ms. Seawright from the ballot, eschewing the legislature's command to reject hypertechnical disqualifications of candidates and refusing to take any account of the effects of the pandemic on her, the election or New York City.  Yet, to needlessly affirm Ms. Hawatmeh's removal from the ballot, the majority disregards the plain language of the Election Law, which unmistakably deems Ms. Hawatmeh's filing timely.  The real losers here are not Ms. Seawright and Ms. Hawatmeh, but the voters, our democracy, and all those who have been struggling to adapt normal practices to abnormal times.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

<u>For No. 56</u>: Order reversed, without costs, petitions by Rebecca Seawright to validate her designating petitions denied and petitions by Louis Puliafito to invalidate Seawright's designating petitions granted. Opinion Per Curiam. Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion.

<u>For No. 58</u>:  Order affirmed, without costs. Opinion Per Curiam. Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Rivera dissents in an opinion. Judge Wilson dissents in a separate dissenting opinion.

Decided May 21, 2020